May it please the court, Mr. Ryder Long made for Petitioner Appellant Juan Reyes. The introduction at Mr. Reyes' criminal trial of Timothy Landon's identification and identification testimony violated Mr. Reyes' due process rights. The United States Supreme Court has set out a clear test for determining when the admission of identification testimony violates a criminal defendant's due process rights. A court first asks whether the police procedures that produced the identification were suggestive and unnecessary. If so, the court then proceeds to consider whether the identification was nonetheless reliable given the circumstances. Actually, that's not its test. The question is whether the misidentification is irreparable. And I was struck by your brief because your brief doesn't even address that question. Judge Easterbrook, I saw your opinion for the court in United States v. Williams where you address this question of whether the identification must be irreparable. Of course, the Supreme Court says in Neal v. Biggers that the test works equally well if you remove the word irreparable when talking about testimony about the out-of-court identification. And the test works when you use the word irreparable when talking about testimony in court identifying the defendant. The state, of course, hasn't made this an issue here. The state court hasn't analyzed that language here. But I think the important point is something that Your Honor actually discussed in United States v.— I must say, it's not Your Honor. Opinions speak for the court, not for their author. One of the things that the court said in United States v. Williams is that over time, a witness may become more certain in his or her identification. And so by the time the witness is presenting testimony in court before the jury may in fact represent that they're more certain about the identification. When I read Neal v.— Could I ask you something? I want to just cut in on that point because I'm interested to know, as the Supreme Court of the United States has articulated these things, what role, if any, social science research plays in determining how suggestive a procedure is? Now there happen to be articles suggesting that this kind of repeated exposure to this same or similar array is quite suggestive and that in fact leads to erroneous identifications. But I want to know what role such evidence plays, whether we're just doing this by the seat of our pants or by assumptions or reliance on old cases. What can you tell me about that? Your Honor, I appreciate the question. Social science clearly is relevant, but we have focused primarily on the Supreme Court's briefings because, of course, we're under the federal habeas standard under AEDPA. And so we have to read what the Illinois Appellate Court has said and ask whether that decision resulted in a decision that was contrary to or involved in unreasonable application of clearly established federal law. The court's opinion— Believe me, we've all got that engraved in our brains, but one thing that the Supreme Court has told us, a critical thing the Supreme Court has told us, are what are the questions we are supposed to be asking? But I don't know that that also means it has told us what kind of evidence we should be using, must be using, are permitted to use to answer those questions. Because if we can get into the social science evidence, this is pretty troubling. Your Honor, I would point the court here to Simmons v. United States. This is 390 U.S. at page 383. And the court there is talking about what's particularly troubling in eyewitness identifications. And they're saying that the danger of a misidentification, quote, will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw—and here's the key part—or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. And I think that— Was that decision itself based on the social science literature? The Supreme Court's decisions in Simmons, Biggers, and Brathwaite, he did look to social science literature and make— Look, let me continue pursuing Judge Wood's question because it bugs me too. You raised Williams. One of the lines in Williams is, and I quote, when lawyers talk is the only thing presented to the judge, there will rarely be a basis for overturning the outcome. And Williams went on to recommend resort to the social science literature. So I looked at your brief to see what it said about the social science literature. The answer is nothing. What it gives is lawyers talk, right? We can find some literature. Judge Wood has done some research. I've done some research. There is some literature about the consequences of repeated exposure to the same photo, although that literature seems to assume that the array is the same. And I gather that here the arrays are different. But isn't that where we need to look rather than stopping with lawyers talk? Your Honor, I think the social science research is helpful, but I would submit that under the Supreme Court's decisions, including Simmons, we actually know the answer. This is not just a matter of common sense, as the court put it in its opinion in Williams. That's the big problem. What the social science literature shows about eyewitness identification is that what people think of as common sense is rarely correct. I would like to take the court to what the Illinois Appellate Court actually said about suggestiveness, however, because... Oh, now I have to interrupt you. I'm sorry, because there seems to be a dispute among the parties as to what exactly the State Appellate Court held about the suggestiveness of the array. The respondents interpret the State Appellate Court as having found that the identification procedures were not unduly suggestive. You state, and I'm going to quote, that the court acknowledged that Officer Garrett's procedures were not free of suggestiveness. So what I'm asking is, what is your position about what the State Appellate Court held about suggestiveness, which you were about to tell us? Thank you, Your Honor. Where I was going with this, and just to connect it to the prior questions from the court, is that we read the Illinois Appellate Court opinion to say that, in fact, Officer Garrett's procedures were suggestive. And I can point you to particular language. And if that's the case, we're just deferring to what the... So I'm looking at page RSA 54. And the court has gone through, at this point, several of the photo arrays. But it says, this is beginning at the second sentence on the top of RSA 54. We find no mitigating circumstances on this latest occasion. This was the fourth time Garrett showed defendant's photograph to Landon. In three of those four times, it was the identical photograph. Nevertheless, considering that the suggestiveness was mitigated on all occasions except the final one, we do not find it to be clearly evident, plain and indisputable, that the photographic identification procedures were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. And I would say a few things about that. So the court, as I read it, is saying, this final array was suggestive. We're saying it doesn't meet the test, the due process test, because we don't find it so impermissibly suggestive. But that test, as I started saying earlier, is the result of doing the reliability balancing that happens once you've already determined that an identification procedure is suggestive. What the court is saying here is, we have repetition. And if you go back, the court talks about pictorial recurrence, which is one of the things that the court was asking about before. It acknowledges that that happened. It also acknowledges that Peasley's photo has been adjacent to Mr. Reyes's photo on each of the prior occasions and was omitted the final time on RSA 53. And the court also acknowledges the emphasis, this is on RSA 34, where the court is talking about how Mr. Peasley somewhat resembled the defendant and goes through and gives a description of how the two look similar to each other. So the court is really acknowledging the factors that I mentioned from the beginning of the argument in Simmons about recurrence and emphasis. You have the recurrence of the pictures. You have emphasis on Mr. Reyes. And then the court simply pivots and says, well, this somehow isn't enough. But when it's saying that this isn't enough, it's confining its analysis to suggestiveness only. And in fact, if you look at RSA 51, the heading there is the suggestiveness of the photographic arrays. And I think it's also telling that what the court says after it's gone through the portion on RSA 54 that I read, it gives a citation to Foster versus California. It says normally suggestiveness is a matter to be argued to the jury. If you trace that citation back to Foster, of course, what Foster says is the suggestiveness of properly admitted identification testimony is for the jury. The test that the court needed to apply was the test I was articulating at the beginning, which is if you have a suggestive and unnecessary procedure, you then have to look at whether the identification was reliable and ask whether the reliability outweighed the corrupting effect of the suggestiveness. Do you make a distinction between the meaning of unnecessarily suggestive and unduly suggestive? I see only on the question of necessity in the Supreme Court opinions, rather than this question of undue suggestion. And I think there's probably been some verbal slippage in some opinions. But when you look at the question of necessity, which is not at issue here, you're really asking, was there some exigent circumstance that police needed to undertake a less than ideal procedure? So you could look at an example like Stovall versus Denno, where the victim witness was in the hospital room. It was unclear at the time of the show up whether she was going to survive. And so it was a justified procedure at that point. Simmons also had elements of necessity. They were saying these bank robbers were on the loose. There was a manhunt. And so it was OK for that reason that police had shown these snapshots with pictorial recurrence of Simmons to the witnesses in that case. And the court said, look, you have necessity and reliability. And you could also take a decision like this court's decision, United States versus Sanders, which has parallels to Simmons, where, again, there's a crime similar to a bank robbery. And because they're trying to catch this armed man who's on the loose, it's OK to show pictures they recovered from a car. So they're really looking to necessity. I think it's critical here that the state's not arguing there was anything necessary about what Officer Garrett did here. And the state court doesn't talk about necessity either. So if that's off the table, what we're left with is saying we have circumstances that the state court is saying the suggestiveness was not mitigated on this final occasion, on the occasion that produced the identification of Mr. Reyes by Timothy Landon. And then just to connect to what the court was asking before, this is why I think we don't need to resort to social science in this context, especially in the epicontext, because we have looked at the factors that we know the Supreme Court precedent makes relevant. It's not just a matter of common sense. And we're saying, OK, we've read the state appellate court opinion. It is said this is suggestive. It's just concluding somehow that the suggestiveness is mitigated. The problem, as I was saying before, is if the court is going to conclude that suggestiveness is mitigated, what it needs to do is then go on and look at reliability. I'd like to reserve the remainder of my time for rebuttal, if that's OK. Certainly, counsel. Mr. Mueller. May it please the court, opposing counsel. I'd like to start just briefly with the question of what the role irreparable has to do in the test. The distinction the Supreme Court had made with irreparable is a distinction between whether you're letting in the in-court identification at the time of trial or whether you're letting in the initial identification that actually takes place in the courthouse. Throughout the litigation, both in federal court and before in state, petitioner has run those two together. And I think the best way to read petitioner's claims have been that both are both should have been suppressed and not allowed. And therefore, the interplay of the two tests both actually had to be met with separate parts. But it doesn't come out that importantly in this instance, because they also have to meet the lesser test with the distinguished identification at the police station. I mean, there were so many failures, honestly, up to and including the suppression hearing. Then you do wind up with the in-court identification. But I'd like to hear your response to Mr. Ryder Longmade's point that the Appellate Court does find suggestiveness in that final round and does not then go on to conduct a reliability analysis under any standard. The response would be first, we, of course, disagree or respondent disagrees that there was a finding of some level of suggestiveness. Well, how do you read this then? I mean, I saw this. All right, the party. It was mitigated on all occasions except the final one. What does it mean by saying except the final one? The Appellate Court was tasked by the Supreme Court precedent of evaluating first whether the techniques used were unduly suggested. I understand, but I'm looking at their I'm sure you've memorized it, but I'm looking at their opinion. Yeah, I don't know how to read that by saying on the final occasion, there was suggestiveness. So then they go on to say, but it didn't matter. Essentially, it doesn't meet the test. But they jump to that point without any kind of analysis of reliability. In the first instance of the Appellate Court's actual finding, if you look at their entire analysis, what they're doing is they're asking, is it unduly suggested? They're going through, they acknowledge, and they actually follow the path that this court has on several occasions. The first asking, is it unduly suggested? That's why the heading is going to be targeted. The heading is going to be about suggestiveness. That's why they bring up that in many cases, you could have repetition become suggestive. But what they then do is because the challenge before them was when we look at the entirety of these five photo arrays, were they suggestive? Not where each was any individual photo array suggested. They went and they went through one by one. And in instances where there were specific mitigation circumstances to that specific photo array, they brought it out. I know that they picked it apart. One time he's under morphine and another time, there are other things. But certainly the social science research, which suggests to you, or would say, these words suggest, social science research finds a lot of trouble with the way this was done. I looked at the different arrays that were included in the record. And the question here is, is there just a gap in the reasoning of the Illinois appellate court's opinion when they say we do not find it to be clearly evident, plain, and indisputable that the photographic identification procedures then has underlining were so impermissibly suggestive as to give rise to, again, underlying very substantial likelihood of irreparable misidentification. How does it get there? The respondent believes, as we put in our brief, that that's actually the proper test, that when you're asking, is it suggestive? So you're thinking you don't need to bother with reliability. Yes. This has nothing to do with it. Yes, Your Honor. This court has said before that you first have to get past whether the procedures without going into the reliability of the appellate system is suggestiveness. And we're stuck with one of the procedures, at least, that the state court thinks was suggestive. I continue to disagree. I don't know that that language says specifically this showing was suggestive. What it's saying is there was nothing in it on that particular array that relates back to the others in the same way. That doesn't change the fact. Considering that the suggestiveness was mitigated on all occasions except the final one. I think it still is picking out there's no individual mitigation. There's no mitigation on the final one. So the suggestiveness remains. Going towards the series. Because, again, it is the entire series that is being challenged. And so I think what has to be done is there's no specific part to that point. But the challenge then becomes, do the other mitigations earlier in the series, did that change it? But even if we go past where you're getting that. Even if the appellate court did find there was some level of suggestiveness, that's not the test put forth by the Supreme Court. The test is, was there a substantial likelihood of irreparable misidentification? And it's not that that's the only test at the very endgame. That's the test at the first point when you ask, was this unduly suggestive? If it is, you then also look at the reliability and ask the same standard again, now adding this new reliability evidence to see if that changes, if that gets you over the line. That doesn't change the fact that you still have to show that the procedures by themselves were unduly suggestive under that irreparable misidentification standard. I've been wondering, why is it mitigating that on one of the four occasions that Landon saw a photo of Ray's, it was a different, more recent photo. Wouldn't it be likely that exposure to either photo of Ray's, the new one or the old one, would make his face more familiar to the witness during a later identification? Your Honor, again, going back to that, this was a challenge based on all the arrays together. One of the way, and this court, similarly to the appellate court, typically starts that type of challenge with the suggestion that, yes, if you show pictures over and over again, there could be some suggestion. But what this court has done then said- There's a learning effect. Right. But there are types of ways you could also mitigate it. And so the idea of using two different pictures of the petitioner, this court has said that has mitigation effects. It is also said that if there's time in between, that's mitigating effects. And there was also time in between here. And finally, if petitioner is not the only one repeated, this court has recognized as mitigating effects. And that was the case between the first two. When you add on the additional mitigating effect of each time there was a prefatory instruction to the witness, what we have is a pattern of mitigating effects versus the repeated pictures. I would like to- Could you repeat that? This court has several times addressed the question of isn't enough to be suggestive that photo arrays contain the suspect's pictures multiple times. In some of those cases, this court has said it can be mitigated if there's enough time in between the showings. There was a large period of time in between the identification made here and the previous showing of his face. As a different mitigating factor, this court has also recognized that if the pictures of the suspect are not the same in each array, that is mitigated. And it also said- Of course, he's not picking the picture in the pre-trial stage. The one picture is the usual one. Then there's one array that has the different more recent picture. Yes. And- And he doesn't pick any of them. He picks Peasley over and over again. He- I would like to- That's another factual disagreement the parties have. There is no confusion and nowhere that he ever picks Peasley as the shooter. He- The witness Landon is always sure that when he's showing Peasley, he is saying, this is the guy I think looks like the shooter. There's some- Well, what does that mean? This is the guy I think that the shooter- I would imagine it, Your Honor, if someone saw my brother, they would know he looks like me and can say, so you're looking for a guy who looks like that, but you'd still know that's not me. But I would like- I would like to touch on the question of whether we can get into the social science. And this court can't. This is a habeas case. There was no social science at heart in the state case. There was none in the district court below. But even if there had been, because this is a habeas case, the only rule that matters comes down to what the Supreme Court has said. The clearly established Supreme Court law. And to this point, the Supreme Court has only ever used lawyer talk. They've only used common sense. And the only time they've ever found something so suggested that it violated due process wasn't Foster. And that was an instance in which there was first a lineup of three people. Defendants stood at six feet and the other two were very short. When that didn't work, police pulled defendant or pulled the suspect in by himself to the witness. And then the witness said something along the lines of maybe. So then the police do another lineup. And it's not till that other lineup that's also somewhat suggested that the witness says that's the guy. And that is the only time the Supreme Court has ever said that suggestive enough to violate due process. That is the only rule the state court had to follow under clearly established Supreme Supreme Court precedents. There are other avenues with which this issue could be approached. There could have been in the state court a post conviction hearing where they could have gotten into the social science. That still wouldn't have come up. This could have come up in a search to Supreme Court from the original direct appeal. It didn't. And because it didn't, because we're in habeas, what the question is, is was the state court reasonable in applying the law? It had the law. It had is largely five Supreme Court cases, none of which have said something like this. The mere repeating of photo arrays, particularly in light of mitigating circumstances, is enough to overturn a conviction. It's a disturbing proposition, actually. Essentially, what you're arguing is matter how inaccurate and, you know, maybe Libra was rising, too. And that was a factor that the Supreme Court relies on. We just have to say, well, you know, astrological evidence is fine by the state court. So it's got to be fine by us, too. Not not by the state court, Your Honor, fine by the Supreme Court. And that's fine. But by no, the Supreme Court is just saying, follow the state court. So I'm going to say it's fine by the state court and Supreme Court says, oh, we never told them not to use astrological evidence because it had never come up. That's that's the nature of habeas. The Supreme Court saying follow the state court. Right. As long as they cited your position is astrological evidence is fine. In the scenario that we're talking about, I believe in that scenario, it would when something is that that problematic, it would most likely come up on the direct appeal. And if it's that rough, the writ of cert, the cert to the United States Supreme Court is the way to do it. This habeas case can't fix perceived problems in the habeas procedure. It's just what the Supreme Court has said, what the legislature has said. And we are stuck with the standard they've given this court. And that also includes even if this was a suggested, even if the court had misused the Supreme Court, petitioner would still have to get over the standard because it's habeas. He'd have to show actual prejudice. He'd have to show substantial and injurious effect. Sure. And this is a case where the harm of potential suggestive procedure, that was all before the jury. So it's already diminishing the harm. Yeah, I take it. This was thoroughly vetted before the jury. Yes, the jury. I believe there is not a single thing that hasn't been in the briefs that didn't come up for the jury. The jury knew it took him five photo arrays, four of which had petitioner in it to pick petition. The jury knew he'd seen the same pictures. The jury knew all this supposed confusion that happened in the testimony because of defense counsel's way of question. So they knew what the harm was. They were instructed on the harm and they still had strong evidence against that. They had two co-conspirators who said, well, we were with petitioner. We planned a robbery. We pretty much took him to the front door. One of them actually sees him go in the front door. We hear gunshots. He comes running back. I shot a guy. That's corroborated by a neighborhood witness was nothing to do with any of the parties who says, I saw this group of men get out of the van where they said they did. I saw them leave it and I saw someone come running back. That's corroborated by Landon, even outside of the identification. He saw someone come into the house, much like the witness said the guy walked in. He sees the shooting and then he takes off because he's been shot. When you put that together, a petitioner just cannot meet the actual prejudice standard, even if this court were to find that the appellate court was unreasonable in its determinations using Simmons. So unless there are any further questions, we would ask that this court affirm the judgment of the district court. Thank you. Thank you, counsel. Anything further? Mr. Roger Longman. Yes, your honor. Thank you. Just a few points quickly on the standard and then on prejudice. First, in Williams, this court said, often the right disposition will be evident with or without the aid of social science. I think that's where we're back to looking at the Illinois appellate court's opinion here. Second, on the question of how much suggestiveness must be shown before you need to look at reliability, this court interpreting the Supreme Court's precedence in Kubat versus theory at 867 F second at 357 said, first, the defendant must establish that the identification procedure was unnecessarily suggestive. Check here. If the defendant meets that burden, the court considers whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification or stated in the affirmative, whether the identification viewed under the totality of the circumstances is reliable despite the suggestive procedure. So to answer that, Mr. Parker, sorry, Mr. Rider long made. What do you do about the fact that the jury, I mean, if we informed about all of the failed identification efforts, it, it was able to weigh whether the in-court identification was the one that it wanted to follow or whether it just thought that language so confused, it didn't matter, you know, couldn't come. And so the jury decides to believe him, the in-court. Your honor, the prosecution was able to make a great deal of the in-court identification itself. This is something we talked at the beginning of the argument about whether it's irreparable. And I'm looking at essay 626. The prosecutor tells the jury, you have to consider that in judging Mr. Landon's credibility, but you also have to consider how he testified the certainty with which he is sure not from the photographs, but seeing the guy in the courtroom. So you have this presented to the jury land is able to make this confident identification. The prosecutor is able to fix it on this and say, this is corroborating evidence. Unlike anything else in the case, the neighbors didn't say anything that tie right, Mr. Reyes to this. There's no physical evidence tying Mr. Reyes to this. The only thing the state has is, is the admitted is a testimony of admitted co-conspirators. So this is unique evidence in the prosecution is able to say, look, he's so confident. And that's exactly the type of danger. I think this court's opinion and Williams warned about. So I would say that the prejudice standard is met here in the court should reverse the judgment of the district court. Thank you. Thank you very much. Counsel and Mr. Ryder long made the court appreciates your willingness and that of your law firm to accept the appointment in this case and the assistance you've been to the court as well as your client. The case has taken under advisement. Thank you.